## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARK AND LORI PESTANA, on behalf of all those similarly situated,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Civil Action No. 08-cv-11593** ) |
| **FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for WASHINGTON MUTUAL BANK; HARMON LAW OFFICES, PC; FEDERAL NATIONAL MORTGAGE ASSOCIATION.** | ) **FIRST AMENDED COMPLAINT** ) **JURY TRIAL DEMANDED** ) ) **Leave to File Granted On** ) **December 24, 2009** ) ) |
| **Defendants.** | ) |

## I.    PRELIMINARY STATEMENT

1.      Plaintiffs Lori and Mark Pestana ("Plaintiffs" or "the Pestanas") are a married couple who, at the time of the filing of the initial complaint in this matter, were being evicted from their home Westford, Massachusetts by Defendant Federal National Mortgage Association ("Fannie Mae") as a result of a foreclosure by Washington Mutual Bank ("WAMU," now represented in this matter by the Federal Deposit Insurance Corporation as Receiver, or "FDIC") and its agent, Harmon Law Offices, P.C. ("Harmon Law) (collectively "Defendants").  As described in detail below, the foreclosure occurred despite WAMU's agreement to postpone the sale and despite the Pestanas' ability to make substantial payments on their mortgage loan and/or to cure the default.  The Pestanas bring this suit on behalf of themselves and a class of similarly situated

Massachusetts residents to challenge, *inter alia,* the lack of good faith during the process of foreclosure.

2.     While it was still operating, WAMU held out to the public that it was willing to accept and consider alternatives to foreclosure, including repayment plans, mortgage modifications, and lump sum payments to cure a default. Borrowers, such as the Pestanas, seeking desperately to keep their homes, relied on WAMU's promises, and made good faith applications for alternatives to foreclosure. In doing so, they gave up other available options to avoid foreclosure including chapter 13 bankruptcy, refinancing, and private sale to preserve equity.

3.     As described more fully in the fact section below, WAMU failed to act on many of the applications it solicited, failed to provide necessary information to homeowners, billed unnecessary costs to homeowners that made cure of defaults impossible, failed to provide homeowners with access to decision-makers, acted arbitrarily and capriciously when responding to applications, failed to provide reasons for denied applications, failed to act on its promises of forbearance, and engaged in unnecessary foreclosures. WAMU's inaction and broken promises left homeowners to twist in the wind.

4.     Harmon Law, for its part, acted as agent for WAMU and Fannie Mae in the execution of the foreclosure and eviction. Harmon Law promised that it will provide necessary information to homeowners about the amount of default and the amounts necessary to cure delinquencies and then failed to do so. Harmon Law's conduct prevented homeowners from paying the amount due to avoid foreclosure. During periods

of delay Harmon Law exacerbated the problem by billing costs and fees to the account that drive up the amount necessary to cure.

5.     The processes for managing delinquent accounts at WAMU and Harmon Law created a nightmare for homeowners who care deeply about saving their homes. The instruments for communication maintained by these Defendants resulted in homeowners making endless dead end telephone calls to computerized systems and answering machines, without receiving any return call or contact. The duty of good faith and fair dealing were routinely violated, as were prohibitions against unfair and deceptive conduct, and forbearance agreements with homeowners. The Pestanas and members of the class have been damaged by loss of home equity, excessive foreclosure fees and costs, and by forgoing better options for preventing foreclosure.

6.     For its part, Defendant Fannie Mae has made an assertion of ownership over the Pestanas' home. In addition, Fannie Mae commenced an eviction, through Harmon Law, based on a claim of ownership that stems from a wrongful foreclosure. Based on its due diligence, Fannie Mae knew or should have known that the foreclosure of the Pestanas' home was wrongful.

## II. JURISDICTION

7.     This matter was removed to this Court by WAMU purportedly based on 28 U.S.C. §§ 1332 and 1441, as amended in relevant part by the Class Action Fairness Act of 2005 ("CAFA"), and authorized by 28 U.S.C. § 1453

## III.     PARTIES

8.     The Pestanas are natural persons who reside at 92 Depot Street, Westford, Massachusetts 01886.

9.     Defendant FDIC is the Receiver for WAMU, which was a mortgage lender and servicer headquartered at 1201 3rd Ave., Seattle, Washington. Prior to its collapse and seizure by the FDIC, WAMU engaged in the business of mortgage lending and servicing on a regular basis within the Commonwealth of Massachusetts.

10.     Defendant Harmon Law is a private law firm whose practice includes debt collection and foreclosures. Harmon's offices are located at 150 California Street, Newton, Massachusetts 02458.

11.     Defendant Fannie Mae is a federally chartered, District of Columbia corporation. See 12 U.S.C. § 1716b. Fannie Mae maintains its principal place of business at 3900 Wisconsin Avenue, NW, Washington, D.C. and has an office at 1900 Market Street, Suite 800, Philadelphia, Pennsylvania. Fannie Mae is a publicly traded corporation, whose shares trade on the New York Stock Exchange.

## IV.     FACTS

### A.  Plaintiffs' Experience with WAMU

12.     The Pestanas purchased their home in 1999, and live in the property with their five year old daughter. Their adult daughter, as well as her husband and infant also reside in the property.

13.     On April 28, 2004 the Pestanas entered into a transaction with Guaranty Bank to refinance the loan on their residence. The loan principle was $275,000.

14.     At all relevant times, the amount due on the loan was less than $280,000.

15.     By 2008, the fair market value of the Pestanas' home was in excess of $400,000.

4

16.     Sometime in 2005, the Pestanas became aware that WAMU was servicing their loan.  On information and belief, WAMU also owned the loan at all times prior to foreclosure in May 2008, having acquired it by assignment from Guaranty Bank or its assignees.

17.     From the initial payment in 2004 through June 2007, the Pestanas made all of their payments on a timely basis to WAMU.

18.     In February 2007, Lori Pestana, a self-employed business consultant, experienced a sudden drop in income when the contract with her largest client ended.

19.     From February 2007 through May 2007, Lori Pestana took employment as the director of a homeless shelter in Manchester, New Hampshire.  While Ms. Pestana had a contract providing for her salary, she was never paid due to the failure of the shelter to obtain a grant.

20.     From February 2007 through June 2007, the Pestanas remained current on their mortgage payments by exhausting their savings and other reserves.

21.     In June 2007, Ms. Pestana called WAMU to explain that the monthly mortgage payment would not be available to WAMU through direct withdrawal as it had been in the past.  The customer service representative responded by changing the automatic withdrawal date from the 1st to the 14th of the month.

22.     The Pestanas paid their June 2007 and July 2007 mortgage payments on July 31, 2007.

23.     Realizing that she would not be able to make the August mortgage payment, Lori Pestana decided to contact WAMU to see if she could negotiate a temporary or permanent solution that would address the potential delinquency.  Her

decision to contact WAMU was influenced by public statements, including statements made on WAMU's website, indicating that WAMU was interested in assisting distressed borrowers through its Homeowners assistance program.

24. Ms. Pestana called the number advertised by WAMU as its customer service number on August 7, 2007 to inquire about receiving help through WAMU's Homeowners assistance program. Lori Pestana was told by the WAMU customer assistance agent that there was nothing that could be done to help her because she was not yet fifty days delinquent. The agent explained that eligibility for WAMU's Homeowners assistance program was contingent on being at least fifty days delinquent in payments and recommended that she allow her loan to become delinquent by this amount of time in order to qualify for the homeowners assistance program.

25. The Pestanas allowed the loan to become delinquent based, at least in part, on the belief that the delinquency would allow them to qualify for temporary or permanent relief in the homeowners assistance program. Although they were facing financial hardship, the Pestanas believe they would have found a way to make subsequent payments, but for the advice of a WAMU representative that they would only get assistance if at least fifty days behind.

26. The Pestanas were contacted by WAMU in the first week of September, when they received a telephone call from WAMU's collections department. After explaining the situation to the WAMU agent, the agent confirmed that eligibility for the homeowners assistance program was contingent on their being at least fifty days delinquent on their loan. The WAMU agent explained that once the Pestanas met this criterion, they would receive an application for the homeowners assistance program in

6

the mail. The Pestanas were instructed to fill out this form and return it to WAMU. When Lori Pestana asked if she should make interim, partial payments on the delinquency, the agent instructed her not to do so, explaining that such an action would disqualify them from the homeowners assistance program.

27.     During the last week of September 2007, the Pestanas received a letter dated September 20, 2007 including an application for the homeowners assistance program. The letter also purported to enclose a document describing the different program options available to the Pestanas, but such a document was not enclosed.

28.     Ms. Pestana called the WAMU customer assistance telephone number upon receipt of the letter in the last week of September 2007. She inquired about the missing document describing the Homeowners assistance program and was told to just send back the application and she would be put into the appropriate program option. Ms. Pestana also inquired of the agent how long it would take WAMU to render a decision on their application, and was told that it would take about four weeks. Ms. Pestana again inquired about making interim payments during this time period and was again instructed not to do so, lest she disqualify herself from the homeowners assistance program.

29.     On October 9, 2007, Ms. Pestana returned the completed homeowners assistance program application to WAMU by first class mail. This application contained the financial questionnaire provided by WAMU, as well as the Pestanas' most recent paystubs, a recent bank account statement, and their most recent tax return. The application also contained a "hardship letter" from the Pestanas explaining their circumstances. Although Ms. Pestana attempted to send it by certified mail, she was

informed that the post office box on the return envelope provided by WAMU did not accept certified mail.

30.     The Pestanas received no response of any kind to the homeowners assistance program application sent on October 9, 2007.

31.     The Pestanas' next loan-related contact was on November 13, 2007 when they received a letter from Harmon Law indicating that Harmon Law had been retained by WAMU and that the entire principal balance of the loan was being accelerated and was now due.  The letter stated the amount outstanding on the loan and informed Ms. Pestana that she could seek to reinstate or pay off the loan through Harmon Law. The letter is attached as Exhibit 1 and bore a legend containing the following statement in bold, capitalized typeface:  "**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**"

32.     In a panic, Ms. Pestana followed the instructions in the Harmon letter to log on to an automated website to request a reinstatement amount.  Simultaneously, the Pestanas began the process of drawing down their retirement savings to obtain funds for reinstatement.

33.     On November 28, 2007, the Pestanas received a letter from Harmon informing them that they could reinstate the loan by tendering $9764.16 by November 30, 2007.  The letter provided an accounting of various charges and fees that had been added to the Pestanas' debt.  Because the retirement savings draw down had not yet been processed, the Pestanas were unable to make this payment in such a short period of time. This letter is attached as Exhibit 2 and bore a legend containing the following statement

in bold, capitalized typeface: "**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**"

34.     On December 11, 2007, the Pestanas received the funds from their retirement savings. Ms. Pestana immediately called Harmon Law to seek the current reinstatement amount, but was routed to a voicemail. She left a message and received no return call. She subsequently called back and was told that she could not make an in-person payment that day, but had to wait 5-10 days for Harmon Law to receive the current reinstatement amount from WAMU. Despite Ms. Pestana's requests to make the payment in person, she was informed that the reinstatement amount could only be transmitted to her by fax or mail. Because the Pestanas did not have a facsimile machine, this requirement prompted Ms. Pestana to buy an "e-fax" account by which she could receive faxes via email. Ms. Pestana called Harmon Law back that same day to inform them of her "e-fax" contact information.

35.     By December 19, 2007, the Pestanas had still not received a current reinstatement amount. This prompted Ms. Pestana to call both Harmon Law and WAMU on that date. Ms. Pestana, despite her best efforts, was unable to talk to a human being and was forced to leave a message at Harmon Law. In addition, she completed another automated reinstatement request form via Harmon Law's website. At WAMU, she was automatically directed to a computerized reinstatement line and entered another request there as well.

36.     By December 31, 2007, the Pestanas had still not received a current reinstatement amount. Ms. Pestana again called Harmon Law and was informed that

WAMU was responsible for that information and had not given it to Harmon Law as of yet. Ms. Pestana immediately called WAMU and was placed into an automated loop where she was again forced to enter an automated request for a reinstatement amount.

37.     Ms. Pestana then called back on a different WAMU number and was transferred through different WAMU agents, one of whom told her that the proper channel was through Harmon Law. Nonetheless, Ms. Pestana was told she would receive a reinstatement figure in 5-10 days. The WAMU telephone representatives refused to give Ms. Pestana any direct number to the homeowners assistance program. Nor would they give her their own direct numbers.

38.     On January 16, 2008, the Pestanas received a letter from Harmon Law indicating that the reinstatement amount was nearly $15,000 and that it was due on or before January 31, 2008.

39.     To Ms. Pestana's surprise, this amount exceeded the amount due on November 27, 2008 plus the past due payments for December and January. Ms. Pestana contacted Harmon by phone that same day because she did not have the full amount available, but wanted to ask if they would accept a partial payment of $12,000. Harmon Law refused any offer of partial payment and directed Ms. Pestana to WAMU, offering only the general telephone number and saying that it had no direct contact information for anyone at WAMU who could negotiate relief.

40.     Harmon Law knew of the Pestanas' plan to cure the default. On information and belief, a portion of the fees and charges sought to be collected by Harmon Law were foreclosure related fees and costs. These expenses should not have

10

been incurred by the Pestanas in light of Harmon Law's knowledge of the Pestanas' intention to cure the default.

41.     That same day, January 16, 2008, Ms. Pestana called WAMU and was again caught up in an endless telephone loop. Trying several different numbers, Ms. Pestana finally reached a customer service representative who purported to transfer her to the department in charge of the homeowners assistance program, but no human being answered the call and she was forced to leave a voicemail message. Ms. Pestana did not receive a return phone call.

42.     On January 22, 2008, the Pestanas received literature in the mail advertising the "Hope Now Alliance." Ms. Pestana researched the organization on the Internet and discovered that it was created by industry leaders, including WAMU, as a means of helping homeowners in distress. Ms. Pestana read on the Hope Now Alliance website statements that such lenders were eager to negotiate with homeowners and go through every effort to avoid having to resort to foreclosure. Delinquent homeowners were instructed to call the Hope Now Alliance, who would assist them in making direct and appropriate contact at their lender to enter into such negotiations. Ms. Pestana was encouraged by these statements and immediately called the number provided on the literature, but was only given another general telephone number with which to contact WAMU. After trying to get through on this number several times, Ms. Pestana was again placed into an endless telephone loop and was forced to make an automated request for a reinstatement amount.

43.     On January 22, 2008, Ms. Pestana found a fax number for WAMU on a consumer website and made several attempts to send an e-fax stating simply, "PLEASE

CONTACT ME" and providing her information.  The fax message was returned after 24 hours of "no answer."

44.     Ms. Pestana repeatedly called WAMU during the last weeks of January and during February, but was unable to reach anyone responsible for the homeowners assistance program.

45.     On February 27, 2008, the Pestanas received a letter from Harmon Law purporting to be a "Notice of Intention to Foreclose Mortgage and of Deficiency After Foreclosure of Mortgage" and a "Notice of Mortgage Foreclosure Sale" for March 26, 2008.  These Notices are attached together as Exhibit 3 and each bore a legend containing the following statement in bold, capitalized typeface:  "**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**"

46.     In response, Ms. Pestana contacted Harmon Law, explained her futile efforts to reach WAMU and requested their assistance to negotiate a loan modification and stay in the home.  Harmon Law indicated that they would inform the bank of the Pestanas' desire to remain in their home and negotiate a loan modification, but referred Ms. Pestana back to WAMU.

47.     When Ms. Pestana called the number provided to her by Harmon Law, she reached a message indicating that the number was no longer in service.  Ms. Pestana again called the general WAMU and left another automated request for contact with no response.

48.     Desperate after her ongoing attempts to reach WAMU had failed, Lori Pestana filed a petition for bankruptcy on March 25, 2008.  Fax notice was sent to

Harmon Law to inform it of the filing and of the automatic stay applicable to the foreclosure sale based on bankruptcy law.

49.     On March 26, 2008, prospective bidders gathered on the Pestanas' lawn for the foreclosure auction.  Ms. Pestana had to call Harmon Law in order to enforce the automatic stay.  Harmon Law indicated that they had not yet processed the fax sent informing them of the Pestanas' bankruptcy the previous day.

50.     In late March, Ms. Pestana was contacted by a mortgage broker, who indicated that he could assist the Pestanas in communicating with WAMU, because his job afforded him access to non-public telephone contact information at the company. Frantic to make meaningful contact with WAMU's Homeowners assistance program, the Pestanas paid this mortgage broker $1000 in cash to get in touch with WAMU on their behalf.

51.     On April 2, 2008, the mortgage broker called Ms. Pestana to tell her that he had spoken with a WAMU agent, and that they promised to send information to the Pestanas on their Homeowners assistance program.  The mortgage broker reported to Ms. Pestana that he was told that she would receive it within 7-10 days.  The Pestanas assumed that the mortgage broker had access to WAMU personnel that would assure WAMU's attention to their account.

52.     In reliance on the mortgage broker's report of positive contact with WAMU, the Pestanas took no action to follow through with their bankruptcy filing. On April 4, 2008, the bankruptcy court dismissed the Pestanas' bankruptcy petition.

53.     As of April 15, 2008, the Pestanas had still not received the information promised to them through their mortgage broker on April 2.  Ms. Pestana therefore called

the mortgage broker to inform him of this fact. The mortgage broker called WAMU on the Pestanas behalf on this date and reported to Ms. Pestana that he had left a message.

54. On April 29, 2008, the Pestanas received a letter from Harmon Law purporting to be a "Notice of Intention to Foreclose Mortgage and of Deficiency After Foreclosure of Mortgage" and a "Notice of Mortgage Foreclosure Sale" for May 28, 2008. These Notices are attached together as Exhibit 4 and each bore a legend containing the following statement in bold, capitalized typeface: "**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE."** In response, Ms. Pestana contacted the mortgage broker. The mortgage broker, in turn, called WAMU and then informed Ms. Pestana that he was able to speak with a WAMU agent on this date. The mortgage broker reported to Ms. Pestana that he was told that the homeowner assistance program information was sent to her on April 28, 2008.

55. On May 5, 2008, the Pestanas received the mailing from WAMU containing the homeowners assistance program information. It was nearly identical in substance to the packet that they had received in September 2007 by which they had applied without receiving a response. The Pestanas quickly compiled the requested information, including the completed financial questionnaire provided by WAMU, as well as their most recent tax return and a new "hardship letter" explaining their circumstances. Ms. Pestana attempted to fax the application back to the number listed in the WAMU letter, but no receiving fax responded for 24 hours. Instead, she mailed the application on May 8, 2008.

56.     On May 12, 2008, Ms. Pestana called WAMU to inquire if they had received their application for the homeowner assistance program. The WAMU agent told her that there was no way to tell whether her application had been received, but that she should expect a call within the next few days.

57.     On May 15, 2008, Ms. Pestana called WAMU again to inquire whether her application had been received. The WAMU agent confirmed to Ms. Pestana that her application had been received and was under review. Ms. Pestana raised the issue of the foreclosure auction scheduled for May 28, 2008. The WAMU agent assured Ms. Pestana on the telephone that while her application was being reviewed, all foreclosure activity would be suspended. The WAMU agent stated further that the Pestanas would be contacted by WAMU either to request additional information or to render a decision on their application for the homeowners assistance program. The WAMU agent stated that this would be the next contact that they would receive regarding their loan and that their home would not be subject to a foreclosure auction prior to a decision being rendered on their application.

58.     Ms. Pestana relied on the promise that the foreclosure would be suspended and took no further action to prevent the foreclosure auction at that time.

59.     Had their application been accepted, the Pestanas were in a financial position to make a lump sum payment to address their delinquency, in part, followed by a resumption of ongoing monthly mortgage payments, together with payments to cure the remaining arrears, if any. The Pestanas believed and continue to believe that they would have been able to make substantial monthly mortgage payments under a modified mortgage plan or under an agreement to cure the mortgage arrears over time.

60.     On information and belief, unbeknownst to the Pestanas, an auctioneer working at the direction of Harmon Law conducted a foreclosure auction of the Pestanas' residence on May 28, 2008.

61.     On May 30, 2008, a real estate agent visited the Pestanas' home and informed them, for the first time, that their home had been auctioned on May 28.  The real estate agent had been hired to offer the Pestanas "cash for keys," or a small one-time payment if they vacated the premises.   The Pestanas refused this offer.

62.     On June 28, 2008, Harmon Law sent a letter to "Occupant" at 92 Depot Street, Westford, Massachusetts giving notice that the home had been sold at auction and that the new owner was "Federal National Mortgage Association, 1900 Market Street, Suite 800, Philadelphia, PA 19103-0012."  This letter is attached as Exhibit 5.

1.     On June 3, 2008, Harmon Law issued a 72 Hour Notice to Quit and Vacate Premises on Lori Pestana "and all other occupants," indicating that Fannie Mae "is the owner of the property situated at 92 Depot Street, Westford, Massachusetts."  The Notice is attached as Exhibit 6 and bore a legend containing the following statement in bold, capitalized typeface:  "**PLEASE BE ADVISED THAT THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND THAT ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE."**

63.     The Pestanas were served with a Summary Process Summons and Complaint dated June 30, 2008 by Harmon Law on behalf of Fannie Mae, indicating an action had been commenced in Ayer District Court.  The Docket Number in Ayer District Court was SP# 08-48SU34.  The Summary Process Summons and Complaint is attached as Exhibit 7.

64.     Following the initiation of the present action, Harmon Law voluntarily

dismissed the Summary Process Action on behalf of Fannie Mae.

**B.     The Defendants' Conduct Exacerbated an Unprecedented Foreclosure
       Crisis Both Nationally and in Massachusetts**

65.     Data from 2008 shows that the rate of foreclosures had since 2007, with

one in every 171 houses nationwide receiving a foreclosure notice.[1]

66.     The situation in Massachusetts was even worse.  From 2006 to 2007, the

Massachusetts foreclosure rate nearly tripled.  There were 7056 filings in 2007.  *See* Kathy

McCabe, "In One Year, Foreclosure Rate Nearly Tripled" in *The Boston Globe* (March 6,

2008) *available at*

http://www.boston.com/realestate/news/articles/2008/03/06/in_one_year_foreclosure_rate_tri

pled/.

67.     In 2008, the problem grew.  The land court reported 3,414 foreclosure filings

in April 2008 alone.

68.     Across the mortgage industry, lenders have acknowledged the foreclosure

crisis and publicized their response to it as one of assisting homeowners in avoiding

foreclosure.  According to the Mortgage Bankers Association, "[t]he numbers of loan

modifications, negotiated repayment plans, short sales and deed in lieu transactions are large

and compare favorably with the number of foreclosure actions started . . . . the mortgage

industry is doing its part to help those borrowers who can be helped."  *See* Jay Brinkmann,

---

[1] *See* J.W. Elphinstone, "U.S. Foreclosure Filings More Than Double" in *The Boston Globe* (July 25, 2008) *available at*
http://www.boston.com/business/articles/2008/07/25/us_foreclosure_filings_more_than_double_in_2q/

Vice-President, Mortgage Bankers Association, "An Examination of Mortgage Foreclosures, Modifications, Repayment Plans, and Other Loss Mitigation Activities in the Third Quarter of 2007" (January 2008) *available at*

http://www.mortgagebankers.org/files/News/InternalResource/59454_LoanModificationsSurvey.pdf.

69.     In 2007, the nation's largest mortgage lenders embarked on a joint enterprise ostensibly to facilitate foreclosure prevention en masse.  The "Hope Now" Alliance was trumpeted by the industry as an effective response to the foreclosure crisis.  *See, e.g.,* Hope Now Press Release, "Hope Now Delivers on Action Plan" (Dec. 19, 2007) *available at* http://www.hopenow.com/media/press_releases/Delivers_on_Action_Plan.html. *See also* "Helping American Families Keep their Homes" *available at* http://www.whitehouse.gov/news/releases/2007/12/20071206-7.html (noting that President Bush has cited Hope Now as an example of "government bringing together members of the private sector to voluntarily address a national challenge"). [2]

70.     Despite their public statements, studies have shown that mortgage lenders are not following through on widespread loan modifications for troubled homeowners.  The California Reinvestment Coalition has issued a series of reports comparing the public pronouncements of mortgage lenders with a survey of actual consumer experiences.  *See*

---

[2] The Hope Now Alliance was also the subject of much criticism.  *See, e.g.*, John W. Schoen, "'Hope Now' Offers Little of Either" in *Newsweek* (March 13, 2008) *available at* http://www.newsweek.com/id/123132?tid=relatedcl.  Referring to the Hope Now Alliance, Schoen writes: "The government's flagship program to give struggling homeowners relief from overwhelming mortgage payments has left hundreds if not thousands of callers frustrated by long wait times, lack of follow-up and relatively minor loan modifications that have failed to help.  A story last week on msnbc.com generated hundreds of e-mail responses from readers who have called the heavily promoted hotline. Almost all the callers said they encountered a variety of roadblocks in their efforts to save their homes."

California Reinvestment Coalition, "The Chasm Between Words and Deeds" *available at* http://www.calreinvest.org/publications ("CRC Study"). The CRC Study indicates that foreclosure is still the most common outcome for homeowners in distress. *Id.* (July 2008 report) at 3. Further, the reports catalogue the difficulties and frustrations that borrowers experience in navigating the bureaucracy of their lender's homeowner assistance programs. *Id.* at 21-22.[3]

71.     In 2008, the Center for Responsible Lending concluded that "existing modification efforts are insufficient" and called on the federal government to expand reform proposals that require only voluntary participation by lenders. *See* Center for Responsible Lending, "Voluntary Loan Modifications Fall Far Short" (Jan. 30, 2008) *available at* http://www.responsiblelending.org/pdfs/paulson-brief-final.pdf. Such calls have led to the federal government's institution of the Homeowner's Assistance Mortgage Program

---

[3] Representative comments collected from housing counselors include the following:
• "…they make it very difficult to remedy the situation before they start defaulting, they wait until all the attorney fees, late fees, workout fees are added to the loan, and it takes 2 months before they even have a negotiator from the bank contact them or come up with a resolution."
• "Confusing telephone prompts with hold times exceeding 45 minutes."
• "Overall, we are STILL not seeing significant changes from our lenders on assisting clients. We are seeing an increase in the number of clients suffering from short-term disabilities that allow them to get behind just enough to start the ball rolling. In these cases, lenders are seeking repayment plans rather than forbearances which would allow clients to get back on their feet. This counseling still remains a struggle and as homeowners are catching on to available services, we are having to seek out the services of mental health groups to help them deal with the depressive disorders that are following the sessions. "
• "The worst part is that they are constantly 'losing' faxed documents, and so we are not able to move forward in many cases."
• "It is difficult to get to the loss modification department or collection department. They never give you the correct phone lines or fax numbers. Lenders continue calling the borrowers from different areas of the continent. We spoke with a loss mitigation office in Central America who had no idea what Housing and Urban Development represented here in the U.S.A."

("HAMP"), which requires the participation of servicers on certain government insured loans, but is otherwise voluntary. HAMP is a program of the Department of the Treasury and was authorized by Section 109 of the Emergency Economic Stabilization Act of 2008, "Foreclosure Mitigation Efforts." 12 U.S.C. § 5219(a).

72.     The failure of the mortgage lending industry to follow through on their public statements regarding homeowner assistance has also been widely reported in the news media. *See*, *e.g.,* Gretchen Morgenson, "Silence of the Lenders: Is Anyone Listening?" in *The New York Times* (July 13, 2008) *available at* http://www.nytimes.com/2008/07/20/business/20debtside.html?_r=1&ref=business&oref=slogin (describing a homeowner whose repeated modification requests went unanswered until the CEO of the lending company accidentally sent a derogatory email response to him); Alan Zibel "Workout Programs Come Under Fire," in *The Chicago Tribune* (June 22, 2008) *available at* http://www.chicagotribune.com/classified/realestate/advice/chi-re-foreclose-rate-0622jun22,0,7677030.story; Carolyn Said, "Mortgage Modifications: Lenders Talking, then Balking" in *The San Francisco Chronicle* (Sept. 13, 2007) *available at* http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/09/13/MNJ8S1FKC.DTL.

### WAMU Publicly Proclaimed Its Assistance for Homeowners in Distress

73.     WAMU's parent company described itself as one of the nation's leading consumer and small business banks, indicating in 2008 that its assets made it the seventh-largest bank and thrift holding company based in the United States. *See* Washington Mutual, Inc., Annual Report (SEC Form 10-K), at 1 (Feb. 29, 2008), *available at* http://www.sec.gov/edgar/searchedgar/companysearch.html, (search for Ticker Symbol

0000933136).  As of December 31, 2007, WAMU's parent company had assets of $328 billion.  *Id. at 16.*

74.     WAMU engaged in a line of business arising from mortgage servicing rights that it owns in connection with home loans.  In exchange for contractually specified servicing fees, WAMU performed all of the administrative tasks associated with such loans, including collection of payments, maintenance of records of payments and balances, collection and payment of taxes and insurance, remittance of funds to the note holder, supervision of the loan modification process and management of delinquencies.  WAMU also performs these functions on loans that it holds.  In 2007, WAMU's parent company realized revenues exceeding $2 billion from home mortgage loan servicing.  *Id.* at 30.

75.     Like other lenders and servicers, WAMU advertised a program to assist borrowers who have fallen behind in their mortgage payments. Referred to herein as the "homeowners assistance program," this program ostensibly consists of a variety of means by which WAMU assisted distressed homeowners who wish to retain their home–including loan modifications and negotiated payment plans.

76.     For example, in April 2007, WAMU and its affiliated corporate entities announced a program under which they would devote $2 billion to assist its borrowers in avoiding foreclosure.  *See* David Gaffen, "WaMu's $2 Billion Plan" in *The Wall Street Journal's Marketbeat* (April 18, 2007) *available at* http://blogs.wsj.com/marketbeat/2007/04/18/wamus-2-billion-plan/.  The Wall Street Journal reported that "investors applaud[ed] the move, boosting shares by 5.3%."  *Id.*

77.    At its November 2007 "Investor Day," WAMU's parent company described itself as a leader in what it characterized as an industry-wide effort to keep delinquent borrowers in their homes, rather than subjecting them to foreclosure.[4]

78.    Despite these pronouncements, there is considerable anecdotal evidence in the public domain that WAMU failed to live up to its self-appointed status as an industry leader in helping distressed homeowners stay in their homes. WAMU was identified in the California Reinvestment Coalition study as among the most difficult companies to work with by federally-funded housing counselors who advocate for distressed borrowers. *See* CRC Study at 8.   In addition, consumer-oriented websites that collect such information illustrate that the plaintiffs' experience was not aberrant or isolated. *See, e.g.*, "Washington Mutual Mortgage" page on Consumer Affairs website, *available at* http://www.consumeraffairs.com/finance/wa_mutual_mort.html (last viewed July 24, 2008).[5]

79.    Borrowers who relied on WAMU's representations of assistance often gave up other options that would better address their financial circumstances.  Among other

---

[4] "It is also critical the mortgage industry do everything within its means to help customers remain in their homes. That's why we led the industry with our $2 billion initiative to help subprime borrowers work through reset periods. It's why we're extending reset periods on both prime and subprime loans. And it's why we're working with community groups and others to counsel borrowers on their alternatives, including loan modification programs versus defaulting to foreclosure."  Statement of Kerry Killinger, Washington Mutual CEO, at "Investor Day" event (Nov. 7, 2007) transcript available at http://investors.wamu.com/IRWebLinkX/GenPage.aspx?IID=102028&GKP=202620

[5] The stories on this website match particularly closely with that of the plaintiffs.  In one story, the homeowner states that he contacted WAMU before he was in serious default but was told that he could not be helped because he was not yet late in his payments. After successfully negotiating to receive a "financial packet," the homeowner reported that he returned the completed forms and received no response.  He discovered several months later that these forms were never reviewed and were sitting on the vacant desk of a WAMU loss mitigation agent who had since left their employ.  *Id.*, Comment of "Vincent of Kissimmee, FL" (July 12, 2008).

things, borrowers could cure defaults pursuant to chapter 13 of the Bankruptcy Code, seek help from homeowner assistance programs that receive government funding, apply to government funded loan programs, seek refinancing arrangements, borrow from friends or family and/or seek to sell their property for a higher price than is likely to be realized at a foreclosure auction.

80.     WAMU's false promises lead to many foreclosures that could or should have been avoided either by WAMU action, by better information to homeowners about the amount necessary to cure, or by homeowners seeking relief from a more reliable source.

81.     WAMU's actions also caused delays that lead to borrowers having thousands of dollars in additional, unnecessary foreclosure fees and costs placed on their account.  As in Plaintiffs' situation, many borrowers can find resources to cure their payment delinquencies, but cannot also find sufficient cash to pay thousands of dollars in foreclosure fees and costs.

82.     WAMU's conduct lead to personal hardships including lost equity, deficiency judgments, destruction of borrowers' credit standing, unnecessary homelessness, and moving costs.  It also contributed to social burdens such as neighborhood deterioration, reductions in property value, concomitant undermining of the local tax base, mid-year school transfers, and burdens on the court system.

83.     WAMU continued to tout its foreclosure avoidance programs long after it was aware of the many complaints about them, and without fixed the problems.

**Class Allegations**

84.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

85.     This class action is brought by the plaintiffs on behalf of themselves and all Massachusetts homeowners whose loans were serviced by WAMU and who contacted WAMU between January 1, 2005 and the date that WAMU ceased operations (the "Class Period") and who either:

    a. applied for assistance without receiving a response within sixty (60) days;

    b. were assessed more than $100 in foreclosure fees and costs while an assistance application was pending;

    c. sought and were not given payoff information and/or information about the amount necessary to cure the delinquency within ten (10) days of the request; or

    d. applied for assistance and were denied relief without a written determination containing reasons for the denial.

86.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

87.     Plaintiffs do not know the exact size or identities of the proposed class, since such information is in the exclusive control of Defendants. Plaintiffs believe that the class encompasses many hundreds of individuals and whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

88.     All members of the class have been subject to and affected by the same inadequate homeowners assistance program application process. There are questions of law and fact that are common to the class, and predominate over any questions affecting

only individual members of the class.  These questions include, but are not limited to the following:

    a.   the nature, scope and operation of  WAMU's homeowners assistance program and its application process;

    b.   whether WAMU's public pronouncements, in conjunction with its operation of a homeowners assistance program that accepts applications, created a duty to respond in good faith within a reasonable amount of time to homeowners who contacted it;

    c.   whether WAMU was aware of and failed to remedy the discrepancy between its public promises and its private lack of action; and

    d.   whether the Court can order damages and enter injunctive relief.

89.      The claims of the individual named plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that both the Plaintiffs and the other members of the class were subject to the same homeowners assistance program and its application process.

90.      The individual named plaintiffs will fairly and adequately represent the interests of the class.  They are committed to the vigorous prosecution of the class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

91.      A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

## COUNT I:  BY THE PESTANAS
## AGAINST FDIC AS RECEIVER FOR WAMU FOR BREACH OF CONTRACT

92.     Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

93.     On May 15, 2008, WAMU agreed not to foreclose on the Pestanas on May 28, 2008 in light of the Pestanas pending application to the Homeowner Assistance Program.

94.     WAMU's conduct described herein, including but not limited to the promise made on May 15, 2008 to Lori Pestana, constituted an enforceable agreement that WAMU would not foreclose without acting on the Pestanas' application.

95.     As of May 15, 2008, the Pestanas had already complied in all respects with WAMU's application process and tendered their qualifications for a payment plan.

96.     At all times the Pestanas were ready willing and able to make payments consistent with the homeowners assistance program that WAMU claimed to be offering and to return the loan to paying status.

97.     WAMU breached the agreement not to foreclose by conducting a foreclosure auction on May 28, 2008, while the Pestanas' application was still pending, failing to respond to the Pestanas' application in good faith, and failing to exercise reasonable diligence in responding to the Pestanas' application.

98.     The Pestanas suffered damage as a result of WAMU's breach including, without limitation, by loss of their residence, the loss of their equity, and fees and costs associated with the foreclosure process.

## COUNT II: BY THE PESTANAS
## AGAINST FDIC AS RECEIVER FOR WAMU FOR PROMISSORY ESTOPPEL

99.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

100.    On May 15, 2008 WAMU's promised not to foreclose without acting on the Pestanas' application for an alternative to foreclosure.

101.    The Pestanas reasonably relied on that promise.

102.    The Pestanas reliance was reasonable in light of WAMU's public pronouncements, material on the WAMU's website, WAMU's statement that they had received the Pestanas foreclosure assistance application and would act on it, and the Pestanas ability to make substantial payments to address the delinquency.

103.    The Pestanas were harmed by their reliance because they otherwise could have taken other action to stop foreclosure and because they lost their home.

104.    Enforcing WAMU's promise is in the interest of justice.

## COUNT III: BY THE PESTANAS AGAINST FDIC AS RECEIVER FOR WAMU FOR WRONGFUL FORECLOSURE, BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

105.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

106.    WAMU's foreclosure was executed in bad faith.  Among other things WAMU:

a.    failed to comply with its express and implied promises to consider the Pestanas application for a foreclosure avoidance plan;

b.    encouraged the Pestanas to default in order to qualify for an illusory program;

27

c.  failed to respond timely and appropriately to the Pestanas' many inquiries about the amount necessary to cure and their other options;

d.  failed to perform loan servicing functions consistent with its responsibilities to customers;

e.  failed to accept payments seasonably tendered or offered for tender;

f.  failed to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

g.  failed to provide the Pestanas with information timely and sufficient to allow the Pestanas to cure the default;

h.  added inappropriate fees and charges to the Pestanas account that prevented the Pestanas from exercising their right to cure;

i.  failed to honor its promise to forbear on its May 28 foreclosure sale while consider the Pestanas' assistance application;

j.  failed to properly consider proposals that would have allowed the Pestanas to avoid foreclosure; and

k.   failed to act in a manner consistent with its contractual and common law obligations of good faith and fair dealing.

107.    The foreclosure sale of the property was wrongful under state common law and the sale is therefore void or voidable.

108.    Plaintiffs are entitled to a declaratory judgment setting aside the foreclosure sale of the property.

109.    Plaintiffs are entitled to an injunction requiring that WAMU take all steps necessary to restore the legal title to the property to the same condition as if no foreclosure sale had ever occurred.

110.    Plaintiffs have suffered damages proximately caused by WAMU's wrongful foreclosure.

## COUNT IV: BY THE PESTANAS AGAINST FDIC AS RECEIVER FOR WAMU FOR INTENTIONAL MISREPRESENTATION

111.    Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

112.    WAMU misrepresented to the Pestanas that it would act on their application(s) for an alternative to foreclosure.

113.    WAMU misrepresented to the Pestanas that it would not foreclose on May 28, 2008.

114.    WAMU's representations were false.

115.    WAMU knew or should have known that these representations were false and intended that the Pestanas rely on these representations.

116.    WAMU's representations were made intentionally.

117.    The Pestanas reasonably and justifiably relied on WAMU's representations, in light of WAMU's public pronouncements, material on the WAMU's website, WAMU's statement that they had received the Pestanas foreclosure assistance application and would act on it prior to further foreclosure activity, and the Pestanas ability to make substantial payments to address the delinquency.

118.    WAMU failed to take action consistent with the representations.

119.     The Pestanas suffered damages by virtue of WAMU's misrepresentations because they otherwise could have taken other action to stop foreclosure and because they lost their home.

## COUNT V: BY THE PESTANAS AGAINST FDIC AS RECEIVER FOR WAMU FOR NEGLIGENT MISREPRESENTATION

120.     Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

121.     WAMU informed the Pestanas that it would act on the application(s) for assistance necessary for the Pestanas to avoid foreclosure.

122.     WAMU informed the Pestanas that it would not foreclose until it considered and responded to the Pestanas' application for assistance.

123.     This information was provided to the Pestanas in the course of its business and caused pecuniary loss to the Pestanas.

124.     The Pestanas reliance on those representations was reasonable and justifiable.

125.     WAMU failed to exercise reasonable care and competence in obtaining and communicating the information including, without limitation, that it knew or should have known that it did not have the manpower to act in a timely fashion on the Pestanas' application(s) and that it knew or should have known that postponing the foreclosure sale required affirmative communication by it to Harmon Law and confirmation that the foreclosure sale would be canceled.

126.     WAMU knew or should have known that borrowers, such as the Pestanas, would rely on representations by it concerning applications for alternatives to foreclosure and postponement of sale dates.

127. The Pestanas were damaged by WAMU's negligent misrepresentations.

## COUNT VI: BY THE PESTANAS AGAINST HARMON LAW
## FOR AIDING AND ABETTING BREACH OF DUTY

128. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

129. Harmon Law was aware of and participated in WAMU's wrongful conduct as WAMU's agent and on its own behalf. Harmon Law received substantial fees and profits for completing the foreclosure, as well as profitable fees paid to third parties over whom Harmon Law had dominion and control.

130. Harmon Law knew that the conduct of the WAMU constituted a breach of duty. Indeed, Exhibit 2 is a letter from Harmon Law to the Pestanas in which Harmon Law states "It is our understanding that you intend to reinstate the loan at a future date." Despite Harmon Law's knowledge of the Pestanas' plan, and WAMU's assistance program, Harmon Law proceeded with foreclosure. Harmon Law intended and did knowingly assist in the execution of these breaches.

131. Harmon Law gave substantial assistance and encouragement to WAMU to commit the breach, which could not have occurred but for the assistance and actions of Harmon Law. In addition to the conduct described above, Harmon Law directly participated in the process leading up to the foreclosure by, *inter alia*, stepping into the shoes of the mortgagee to execute and notarize the mortgage assignment that transferred the mortgage to WAMU. This mortgage assignment is a matter of public record, having been recorded with the Middlesex County (North) Registry of Deeds at Book 22043, Pages 56-57 and is incorporated by reference herein. On information and belief, Francis J. Nolan (executor as "Assistant Secretary and Vice President of Mortgage Electronic

Registration Systems, Inc.") and Eamonn Sullivan (notary) are, in fact, employees of Harmon Law.

132.    Harmon Law knowingly aided and abetted the breach of WAMU's duty by conduct including, without limitation:

   a.  failing to respond timely and appropriately to the Pestanas' many inquiries about the amount necessary to cure and their other options;

   b.  failing to accept payments seasonably tendered or offered for tender;

   c.  failing to stop the foreclosure process when it could not get information from WAMU about the amount necessary to cure the default;

   d.  billing for unnecessary fees and costs in light of its awareness of the Pestanas plan and ability to cure all delinquent amounts;

   e.  failing to provide information to the Pestanas about their rights as mortgagors; and

   f.  failing to take steps consistent with its obligation to preserve the Pestanas' equity interest in the property.

133.    As the primary participant executing WAMU's duty of good faith, Harmon Law was required to take reasonable steps to protect the Pestanas' equity interest in their property including providing the Pestanas with information necessary to cure the default and avoid foreclosure.  At all times relevant to the Complaint, the Pestanas had equity in their property because they owed less than the fair market value to WAMU.

134.    Harmon Law knew or should have known that its conduct would result in an unnecessary and avoidable foreclosure.

135.    Harmon Law has not established practices that would allow its clients to comply with the duty of good faith in connection with Massachusetts foreclosures.

136.    The Pestanas were damaged by Harmon Law, including but not limited to the assessment of fees and charges to their outstanding debt totals.

**COUNT VII: BY THE PESTANAS AGAINST HARMON LAW FOR VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692 *et seq.***

137.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

138.    By acting to foreclose a mortgage in the wrongful circumstances described above, Harmon Law violated 15 U.S.C. § 1692f, which prohibits debt collectors from using unfair or unconscionable means to attempt to collect a debt.  Included among the violations of that section are instances in which the debt collector takes or threatens to take any nonjudicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest. 15 U.S.C. § 1692f(6)(A).  WAMU had no present right to effect dispossession for the reasons described in Counts I – V.

139.    Further, Harmon Law violated 15 U.S.C. § 1692e, which prohibits debt collectors from using false, deceptive or misleading representation or means in connection with the collection of any debt, by conduct including but not limited to:

        a.    failing to respond timely and appropriately to the Pestanas' many inquiries about the amount necessary to cure and their other options;

        b.    failing to accept payments seasonably tendered or offered for tender;

c. failing to stop the foreclosure process when it could not get information from WAMU about the amount necessary to cure the default;

d. billing for unnecessary fees and costs in light of its awareness of the Pestanas plan and ability to cure all delinquent amounts;

e. failing to provide information to the Pestanas about their rights as mortgagors; and

f. failing to take steps consistent with its obligation to preserve the Pestanas' equity interest in the property.

140. Harmon Law regularly attempts to collect debts alleged to be due another, as illustrated in the letters and notices sent to the Pestanas and attached as exhibits hereto. In addition, these letters and notices illustrate that Harmon Law uses the mails for a business purpose of enforcing security interests. Harmon Law is therefore a debt collector as defined by 15 U.S.C. § 1692a(6).

141. The Pestanas are consumers as defined by 15 U.S.C. § 1692a(3) because they are natural persons obligated or allegedly obligated to pay a debt.

142. The notices and letters sent by Harmon Law and attached hereto are communications as defined in 15 U.S.C. § 1692a(2).

143. The FDCPA is a strict liability statute that is to be construed liberally so as to effectuate its remedial purpose. *See Pettway v. Harmon Law Offices, P.C.*, No. 03-CV-10932-RGS, 2005 WL 2365331 at *3 (D. Mass. Sept. 27, 2005).

144. The Pestanas are therefore entitled to relief available under FDCPA, 15 U.S.C. § 1692k.

## COUNT VIII: BY THE PESTANAS AND THE CLASS AGAINST FDIC AS RECEIVER FOR WAMU FOR BREACH OF THE OBLIGATION OF GOOD FAITH AND FAIR DEALING

145. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

146. WAMU was obligated by contract and common law to act in good faith and to deal fairly with borrowers who seek an alternative to foreclosure.

147. WAMU routinely and regularly breached this duty by:

    a.   failing to comply with its express and implied promises to consider applications for foreclosure avoidance plans;

    b.   advertising and then failing to deliver on promises to assist borrowers seeking to avoid foreclosure;

    c.   failing to respond timely and appropriately to borrowers' inquiries about the amount necessary to cure and their other options;

    d.   failing to perform loan servicing functions consistent with its responsibilities to customers;

    e.   encouraging borrowers to default as a means to access assistance that later proves to be unavailable;

    f.   failing to accept payments seasonably tendered or offered for tender;

    g.   failing to provide sufficient staff to address customer inquiries and act on applications for assistance;

    h.   implementing a telephone system in which desperate borrowers cannot speak with a WAMU employee;

    i.   failing to respond to telephone messages;

j. failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

k. failing to provide borrowers with information timely and sufficient to allow them to cure their defaults;

l. adding unnecessary and inappropriate fees and charges to borrowers' accounts thus undermining their right to cure; and

m. failing to honor express and implied promises to meaningfully consider applications for alternatives to foreclosure.

148. As a result of these failures to act in good faith and the absence of fair dealing, WAMU conducted unnecessary and unlawful foreclosures, profited by collection of improper late charges and other fee income, and caused severe physical and emotional distress to class members seeking to save their homes.

149. WAMU knew or should have known that class members rely on it to assist them with foreclosure prevention options and that by failing to deliver on express and implied promises of assistance, WAMU prevented class members from pursuing other avenues of relief.

150. The Pestanas and the class have suffered damages.

## COUNT VIII: BY THE PESTANAS AND THE CLASS AGAINST FDIC AS RECEIVER FOR WAMU FOR NEGLIGENT MISREPRESENTATION

151. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

152. WAMU represented to the public and to members of the class that it would accept and act on applications for assistance by homeowners seeking to avoid foreclosure.

153. This information was provided to the public and to members of the class in the course of WAMU's business.

154. Members of the class relied on those representations. Such reliance was reasonable and justifiable in light of the nature and frequency of WAMU's public and private communications on these issues.

155. WAMU failed to exercise reasonable care and competence in obtaining and communicating the information including, without limitation, that it knew or should have known that it did not have the manpower to act in a timely fashion on class members' application(s) and that it has not designed systems that allow it to act.

156. WAMU knew or should have known that members of the class would rely on its representations concerning applications for alternatives to foreclosure.

157. The Pestanas and the class were damaged by WAMU's negligent misrepresentations.

## COUNT IX: BY THE PESTANAS AGAINST FANNIE MAE TO QUIET TITLE – G.L. c. 240

158. Plaintiffs repeat and reallege all paragraphs above as if set forth fully herein.

159. As illustrated in Exhibits 5, 6 and 7 attached hereto, Fannie Mae has represented itself, through counsel, to be the owner of 92 Depot Street in Westford, Massachusetts. No foreclosure deed has been recorded with the Middlesex (North)

County Registry of Deeds to reflect Fannie Mae's purported ownership. Fannie Mae is therefore a necessary party to this action.

160. At all times relevant to this Complaint, the Pestanas have been in possession of their home at 92 Depot Street in Westford, Massachusetts.

161. The foreclosure that purportedly occurred in May 2008 was void *ab initio* or voidable, for the reasons described above.

162. Fannie Mae, through its due diligence and review practices, was aware of or had access to the information forming the basis of this First Amended Complaint.

163. For these reasons, the Pestanas, and not Fannie Mae, remain the rightful legal owners of 92 Depot Street, Westford, Massachusetts.

**REQUESTED RELIEF**

WHEREFORE, the Pestanas respectfully request that this honorable Court:

- a.) assume jurisdiction over this matter;
- b.) certify this case as a class action and appoint the Pestanas to be class representatives and their counsel to be class counsel;
- c.) issue declaratory and/or injunctive relief setting aside the foreclosure sale and quieting title in the name of the Pestanas;
- d.) award damages, attorney fees and costs to the Pestanas and the class on each claim set forth above;
- e.) award such other relief as it deems necessary in equity and the interests of justice.

Respectfully Submitted,
Lori and Mark Pestana
By their attorneys,

*/s/ Gary Klein*
Gary Klein BBO #560769
Elizabeth Ryan, BBO # 549632
Kevin Costello, BBO #669100
Roddy, Klein & Ryan
727 Atlantic Ave., 2nd floor
Boston, MA  02111
Tel. 617-357-5500
Fax. 617-357-5030

Dated: December 28, 2009

## CERTIFICATE OF SERVICE

I, Kevin Costello, certify that this document will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper

copies will be sent to those indicated as non registered participants on December 28,

2009.

*/s/ Kevin Costello*
Kevin Costello